In the matter of J. EDWARD SMITH, a solicitor of the court of chancery of New Jersey.

[Decided April 29th, 1915.]

1. An unexplained delay by a solicitor in the prosecution of a suit for his client is not of itself malpractice justifying disbarment.

2. A mistake by a solicitor in drafting a petition in a suit prosecuted for his client, resulting from oversight, or, at most, from negligence, is not malpractice justifying disbarment.

3. Evidence *held* to show that a solicitor, in prosecuting a suit for a client, was guilty of malpractice justifying disbarment.

4. "Malpractice" by a solicitor comprises any conduct which shows such intentional fraud on the court or client as is evidence of moral turpitude.

On application for adjudication of malpractice.

*Mr. Nelson B. Gaskill,* for the rule.

*Mr. Francis Child, contra.*

EMERY, V. C.

This is a proceeding against a solicitor of this court alleging malpractice, and is based upon an affidavit of the client relating to the solicitor's conduct in the prosecution of a suit for divorce against the client's wife. The affidavit is not drawn in the shape of a formal charge, but sets out the client's statement of facts relating to the employment and conduct of the solicitor. Upon this statement an order was issued, directing the solicitor to show cause why he should not be adjudged guilty of malpractice in the matters set forth in the affidavit. Upon this affidavit and order the matter was referred to me for hearing by the chancellor, of his own motion, and also to advise the order or decree to be made. On the oral hearing before me the solicitor has appeared and testified, and his counsel have been heard. No formal answer has been filed nor application to file one made by the respondent or his counsel. The affidavit shows substantially

an employment of the solicitor in May, 1911, to conduct for his client an action for divorce against his wife for the sum of $150, of which the client had paid $92; that the petition was filed on June 28th, 1911, and a citation then issued, but that nothing further was done until March 4th, 1912, when another citation was issued and returned by the sheriff, not served because of non-residence in the state; that on April 15th, 1912, Advisory Master Biddle filed a memorandum in the case, calling attention to a defect in the petition, apparent on its face, and stating that an amended petition should be filed at once so as to avoid delay. The affidavit of the client, sworn to on May 16th, 1914, further charges that since the filing of this memorandum no further action had been taken by the solicitor in the prosecution of the cause, and that upon learning of this failure of the solicitor to proceed with the cause, he refused to pay him any more money; that in the early part of April, 1914, the solicitor demanded of him the payment of $25 to go to Trenton and revive the cause, which he refused to pay.

The client and the solicitor were the only witnesses examined, and by the evidence these facts appear: The solicitor was employed in May, 1911, to prosecute this action for divorce, and agreed to do so for the sum of $150. This amount, however, was not to be paid at once, but as the suit progressed. Twenty-five dollars was paid about the time of the employment, May 20th, 1911, and a further sum of $25 before the filing of the petition, June 28th, 1911. At the time of filing the petition the client was a resident of Newark, and had been for about two years. His wife resided in Massachusetts. The marriage had taken place in Massachusetts in 1899, and the ground for divorce was adultery in May, 1905, with a man named Grace, committed in the State of Rhode Island. At the time when this cause of action for divorce arose, in 1905, the client resided in New York City, and removed to Newark in June, 1909. These jurisdictional facts were set out in the petition, but following them was the further allegation (paragraph 3) "that adultery by either of the parties to a marriage is recognized as a valid cause for a divorce from the bonds of matrimony by the laws of the State of Rhode Island." The defect in the petition to which the advisory

master called attention was, that under the Divorce act of 1907, section 7b, where the petitioner became a resident of this state after the cause of action arose, the petition must show that the cause alleged was a ground of divorce in the state where the petitioner then resided—that is, New York—and not where the offence was committed, and that the law of New York, rather than that of Rhode Island, should have been pleaded. He advised an immediate amendment to avoid delay.

This defect could have been cured immediately, as it required no change in the facts stated in the petition except as to the state whose law was applicable to the cause of action stated. But a delay of ten months had already occurred, and in the meantime the client had paid the solicitor $25 in October, 1911, $15 on March 16th, 1912, and a further sum of $2, making in all, $92. On July 25th, 1911, nearly a month after filing the original petition, a citation returnable August 26th, 1911, was issued, and by the solicitor mailed to the sheriff on July 25th, 1911, with information as to defendant's residence in Massachusetts, for affidavit on return. The sheriff's affidavit, taken on July 27th, was annexed to the citation. This citation and return was not, however, returned to the clerk's office. It was produced on this hearing by the solicitor, and his explanation of the failure to return is that the citation had been lost in the sheriff's office or mislaid. It appears, however, that on October 7th, 1911, another payment of $25 was made without apparently any steps to procure the return or to issue a new citation until March 4th, 1912, when another citation was issued, returnable April 6th, and mailed by the solicitor to the sheriff on March 14th, with the same information as to residence of defendant in Massachusetts, as had been given on the original citation. To this return by affidavit dated March 14th, 1912, was made. Two days later, on March 16th, another payment of $15 was made, an amount sufficient to cover costs of advertisement on publication. In April, 1912, and before April 15th, the solicitor sent to the clerk the order for publication, and upon application for this order, the defect in the petition above referred to was called to the attention of the solicitor. In the meantime the client had left his residence in Newark, 285 Peshine avenue, and the solici-

tor writing to him at his Newark address, his letters were re-
turned.   One of these letters, dated May 28th, 1912, refers to
a letter written three weeks before, to which he had received no
reply, and says, "It is necessary that you see me if you wish to
continue your case, also I asked you for a remittance."   This
letter gave no information about the case, or the point which
had arisen.   On May 30th, 1912, the client wrote to the solicitor,
stating that he was too busy to see him when he got the letter,
inquiring how his case stood, as it had been a year since it began,
and wished to know when he would get his papers.   He said he
would pay the balance of the money just as soon as the papers
were ready.   On or about June 28th, the client did see his solici-
tor in Newark, and an amended petition was sworn to on that
day by the petitioner, before a master in chancery, at Newark.
This petition differs from the first petition only in the third
paragraph, and in changing the words "laws of the State of
Rhode Island" to "the laws of the State of New York in 1905."
The residence of the petitioner in the amended petition as sworn
to was still alleged to be the city of Newark, since June, 1909.
This amended petition, although sworn to, was never filed, and
from the evidence of both solicitor and client, it is evident, I
think, that in connection with the filing of this petition, and
going on with the cause, there was conversation upon the subject
of the residence of the client in New Jersey during the continu-
ance of the suit.   The client says that his solicitor told him that
all that was necessary was that he should have an address in New
Jersey, and that Jersey City was suggested as a convenient place
for the address.   The solicitor, on the other hand, says that he
told the client he must continue to have a bona fide residence in
New Jersey till he got his decree.   The solicitor, at the time of
procuring this amended petition, stating that the petitioner then
resided in New Jersey, had, as he says, doubts about the filing
of the petition.   But he at no time explained, or claims to have
explained, to the petitioner that the amendment of the petition
was made necessary by his own mistake, and that the failure of
the proceedings to procure a divorce on the original petition was
due to his own mistake.   Notwithstanding this situation arising
from his own mistake, which hazarded the loss of all the money

previously paid, the solicitor continued to demand further payments than those already made in connection with the proceedings, even on the amended petition, which would fail unless a *bona fide* residence for the two years before filing it were proved. This was apparently not possible to prove. By the letter of May 28th, 1912, above referred to, he asked for a remittance, and by another letter, written on October 24th, 1912, to his client at the address given in his letter of May 30th, 1912 (1006 Intervale avenue, Bronx), he encloses another petition to be sworn to before a New Jersey lawyer and returned to him, "as I shall have to take same to Trenton next week; also send me, by post-office order, $25 to be used in the case. Also keep me informed from time to time where you are." This letter was returned to the sender. Under the rule 163a, the amended petition sworn to on June 28th, 1912, not having been *filed within eight days*, could not be filed without special order of the chancellor. After the return of this letter, no further effort seems to have been made by the solicitor to procure any amended petition to be sworn to, nor was any ever filed. The client did, however, subsequently see the solicitor about the case in April, 1914. At this time, at an interview in the solicitor's office in Newark, the solicitor, according to the client's statement, said that he was going to drop the case because "I had not done what he wanted me to do—that he could not find me when he wanted me, and that if I wanted to revive the case I would have to give him $25." The solicitor's account of this interview is that he went over the whole case with his client and then told the client (who came over to see him with another young man) that if he wanted him to carry on the case properly, he must stay here in this state and make it his home, that he had said he was a *bona fide* resident of New Jersey. In that interview the client said, "I will come back to New Jersey and stay here." "I said, 'All right, I will revive the case. You send me $25, and when we reach the special master you can pay the balance,'" to which the client said, "All right, I will move to New Jersey." The solicitor says that after writing two or three times and getting no reply, "I finally got a reply that he was living on Summit avenue, Jersey City." This letter produced by the respondent is as follows:

"As you told him that I must retain an address in Jersey City, I am giving you a Jersey address.

"618 Summit Ave., Jersey City,
"Care of Mr. Wilson."

This letter is dated 9/14, probably April 9th, and in reference to the requirement necessary for a New Jersey residence, seems to corroborate the statement of the client that he was told (or understood that he was told) by the solicitor that an address in New Jersey was all that was necessary. It was written for the client by a woman friend.

On April 8th, 1914, the solicitor wrote to the client that it would not be necessary for him to come over now, unless he wished to—"just send the P. O. order for $25. I will take care of the rest. You cannot help things by coming here now—the money is what I need to send to Trenton." On the 14th of April, 1914, he again wrote as to changing his office and added, "Am waiting for that P. O. money order." The client, shortly after the receipt of this letter, and without again seeing the solicitor, wrote letters to public officials in reference to the case which resulted in these proceedings taken on his affidavit.

The substantial charge of malpractice made by the affidavit is that the solicitor having received a large part ($92) of the payment on account of which he agreed to prosecute the action, took no proceedings beyond the issuing of a citation shortly after the filing of the petition, and, after the subsequent delay of nearly three years, refused to proceed further with the case until an additional $25 was paid. The further statement in the affidavit that the client refused to pay this sum is not true if it meant that he refused to pay it when demanded or asked, for the proof is, both by his own evidence and the solicitor's, that at this time he agreed to pay it, and the failure to do so was the result of inquiries subsequently made which led him to doubt the solicitor. This statement, however, is not material to the charge of malpractice in demanding or requiring the payment of the $25 before proceeding with the case.

On the whole evidence there can be no reasonable doubt, I think, as to the conduct of the solicitor. On his own evidence, and that of his own letters to his client in October, 1912, and

April 8th and 14th, 1914, it is clear that he intended to have his client understand that he would not proceed further with the cause until he received an additional $25, and that the filing of the amended petition (in October, 1912), or the revival of the cause, as he called it (in April, 1914), waited on this receipt of this further payment in addition to what had been paid. The question is, was this demand made on the client in April, 1914, under the circumstances of the case, malpractice? I conclude that it must be so considered, and for the reason that this demand cannot be fairly considered as having been then made with any intention to proceed in the cause in good faith. Neither at that time, nor at any time since April, 1912, when the solicitor's attention had been called to the defect in the petition, would it have been possible to proceed in the cause except upon an amended petition. The solicitor understood this and prepared his amended petition as early as June, 1912, and then had it sworn to by his client. The amended petition, like the original, asserted the petitioner's residence in New Jersey since June, 1909, and the solicitor at that time understood the necessity, under the Divorce act, for such continued residence up to at least the time of filing the amended petition. From information received from his client, such continued residence from some months after the filing of the original petition was questionable, while on this point the original petition could not be questioned. The solicitor apparently gave no intimation to his client that his mistake or oversight in the draft of the original petition had, by reason of the client's removal from the state, raised a question about ultimately succeeding on the amended petition, because of the change of residence, and by his promise to go on with the suit he induced the client to believe that this suit could be further prosecuted—"revived," as the solicitor called it, and made the further advance the condition of going on with it. The request made by the letter of October, 1912, enclosing an amended petition to be sworn to and returned, is entirely consistent with an intention to prosecute the suit in good faith on the solicitor's part. But the failure subsequent to this time to take any steps to amend the petition (which was the only way to further proceed), or to suggest this to his client, either by his

letters or in his interview in April, cannot, in my judgment, be reconciled with any honest intention to take any further proceedings in court in the cause. And the solicitor's statements in his letters of April 8th and April 14th, 1914, as to the proceedings intended to be taken, and the method proposed, confirm this conclusion, that he had no intention then of filing an amended petition. On April 8th, he says: "Send me the P. O. order for $25. I will take care of the rest. You cannot help by coming here now; the money is what I need to send to Trenton." The thing, and the first, if not the only, thing, needed at that time to proceed with the cause, as the solicitor well knew, was the amended petition, and for this the client was needed, and needed at the solicitor's office in New Jersey, where apparently he was ready to come, and for the filing of the amended petition, or any other expenses, no further money was needed to be furnished by the client for "sending to Trenton," as the solicitor also knew. In the letter of April 14th, 1914, another request for the post-office order is made, and like the other, still without any intimation that an amended petition signed by the client or any other act of the client was essential before the suit could go on, or any further money be honestly taken on the promise of proceeding with his suit. On the whole evidence, I cannot avoid the conclusion that when the solicitor, in April, 1914, made this request for the additional payment, he did not do so with the intention of going on with the suit, and in making the request or demand for payment as a condition for going on with the suit, he was guilty of malpractice.

There was, undoubtedly, an unexplained delay in the prosecution of the suit up to the time of the issuing of the second citation, but this of itself was not malpractice. And while the mistake in the drafting of the original petition was also chargeable to the solicitor, this also might have resulted from oversight, and was at the most negligence, not amounting to anything like malpractice. But having been informed of the necessity of commencing proceedings anew, as the result of his own oversight or mistake, the solicitor, when he was confronted with the new difficulty on the point of residence, which must arise on the amended petition by reason of his client's removal from the state

after the filing of the original petition and before the discovery of the error, undertook at first (without any explanation to his client of his own share in giving rise to this new obstacle) to carry on the proceeding by amended petition, but subsequently abandoned any necessary steps in this direction. Yet, during the whole time, he continued from time to time to press for further payments to be made on account of the original bargain, and on the faith of the original suit going on to a conclusion by amendment, or otherwise. By the solicitor's mistake in the draft of the original petition, in connection with the client's removal from the state after the filing of the petition, the proceeding on the basis of this original petition, and the facts stated therein, was probably made wholly nugatory, and the money already paid to the solicitor was practically lost. The demand or request for further advances, even on account of the continuation of the suit, if in good faith, intended to be continued by amending the petition, would have been very questionable, in view of the character of the evidence as to the petitioner's residence in New Jersey. And a demand or request continued, as I find it to be, without intention to continue the suit by amendment, cannot, in my judgment, be characterized by any term milder than malpractice.

Malpractice, according to our decisions, comprises any conduct which shows such intentional fraud upon the court or a client as shows evidence of moral turpitude. *In re John Francis Cahill, 66 N. J. Law 527.*

I will advise a decree finding the respondent guilty of malpractice on the matters charged.

The foregoing conclusions and report, after being sent to the chancellor, were afterwards considered at a conference of the chancellor and vice-chancellors, called by the chancellor, at which the finding that the respondent was guilty of malpractice in the matters complained of was unanimously concurred in, and the chancellor and vice-chancellors were also unanimously of opinion that the respondent should be disbarred.

My own ground of advising disbarment is that the facts proved clearly show that the solicitor is unworthy of the confi-

dence of clients, or to be trusted with the duties and responsibilities of solicitor. No circumstances appeared which would justify any expectation that a suspension for a limited time would, in this case, be likely to afford to any future clients the protection to which they would be entitled, and therefore disbarment is the proper remedy.